William OTTE, as Trustee in Bankruptcy of Personal Typewriter Co., Inc., Plaintiff,

v.

FRANKLIN NATIONAL BANK OF FRANKLIN SQUARE, N. Y., Commercial State Bank & Trust Company of New York, Murray J. Levy and Robert Siegel, Defendants.

FRANKLIN NATIONAL BANK OF LONG ISLAND, Third-Party Plaintiff,

v.

FUNDS FOR BUSINESS, INC., Third-Party Defendant.

Civ. A. Nos. 18608, 18826.

United States District Court
E. D. New York.

Dec. 29, 1959.

Jacob F. Gottesman, New York City, for plaintiff.

Maurice, McNamee & White, New York City, for defendant and third-party plaintiff, Franklin Nat. Bank, Stewart Maurice, New York City, of counsel.

Livingston, Livingston & Harris, New York City, for Commercial State Bank & Trust Co., David Haar and Charles Raskin, New York City, of counsel.

Harold Simon, New York City, for defendants Murray J. Levy and Robert Siegel.

Delson, Levin & Gordon, New York City, for third-party defendant, Funds for Business, Inc., Harry T. Kirp, New York City, of counsel.

BYERS, District Judge.

These cases were consolidated for trial (Pre-Trial Order, May 14, 1959) which proceeded on October 21, 22 and 23. Final briefs were filed on November 17, 1959.

The court has not been provided with the minutes of the trial. There are eleven so-called briefs and memoranda before the court, none of which contains a concise chronological statement of all the facts.

In the first action (complaint filed April 4, 1958) the trustee seeks to recover from the two banks, to be called Franklin and Commercial, respectively, the sums of $9,747.20 and and $11,382.90, as asserted in the fourth and fifth causes of action pleaded in the complaint. As to the Franklin, judgment is also sought against the individual defendants Levy and Siegel jointly with the bank.

There is also a complaint (filed June 27, 1958) and answer (filed Sept. 15, 1958), No. 18826 (the second cause) wherein the trustee seeks judgment against Funds to recover $9,682.74 said to constitute a preferential payment under the Bankruptcy Act, 11 U.S.C.A. § 1 et seq.

In No. 18608 the Franklin Bank has filed its third-party complaint (Feb. 5, 1959) against Funds, seeking relief against it, in the event of being held liable to the plaintiff.

The plaintiff's main theory is understood to be that these banks permitted the bankrupt and Northern (later described) to operate their accounts without exact compliance with certain formal requisites such as resolutions of the directors, etc., as a result of which the checks deposited in Franklin were used to meet a corporate check drawn to the order of Funds for Business, Inc., to be called Funds, and collected by it. As to the Commercial account, that the checks drawn cannot now be shown to have been applied to the corporate purposes of Personal. This will be discussed below.

As to neither account is there an assertion that the bank itself benefited in any way from the criticized handling of corporate deposits; this means that there was no transfer to either bank which could be attacked under the Bankruptcy Law.

The depositor, as to Franklin, was Personal Typewriter Co., Inc., to be called Personal.

That was a New York corporation as to which a certificate of incorporation under another name was filed on August 30, 1956 and thereby corporate existence was created. The capital stock was said to consist of 200 shares of no par stock; the original name was changed to Personal on or about September 14, 1956. There were organization minutes prepared but never signed. Directors' minutes dated September 10, 1956 were likewise prepared but also not signed, which recite the election of Hyman Gardner as president and John O'Rourke as secretary-treasurer. No stock certificates

were issued, but as of about the last mentioned date Gardner and O'Rourke acted as the only two officers and stockholders of this incompletely organized corporation. They may be regarded as de facto officers for the purposes of this case, but they were not careful in signing corporate papers to distinguish between the offices of president, vice-president, or secretary and treasurer.

They were the officers and probably the principal stockholders also of Midland Commercial Corporation of Newark, New Jersey, to be called Midland, which among other things was financing several enterprises, one being Northern Appliance Stores, Inc., to be called Northern. That was a subsidiary of Midland, marketing Underwood typewriter machines and similar devices. Its store was in Great Neck, Queens County, and nearby was the store of Personal.

The purpose of creating Personal was to sell Remington Rand typewriters which Northern was not supposed to do since it was an Underwood machine distributor.

The organization of Personal was in the nature of a subterfuge and these two enterprises were really operated jointly at the separate addresses, and it is difficult to believe that in the practical sense Remington Rand was unaware of the true facts. There is testimony to the contrary.

An understanding of this situation, which has not been too clearly brought to light, is the necessary basis of an approach to the somewhat casual attention given by the banks to their handling of these two accounts. The period of time involved in these transactions comprises the months of December 1956 and January and February, 1957 and it was during that interval that the individual defendants, Siegel and Levy, took over the stockholdings of Gardner and O'Rourke in Midland and management and control of that corporation, but the approximate effective date cannot be stated; as an incident thereto, Siegel and Levy took over the practical operations of Northern and Personal, which it

is to be remembered was a mere adjunct of Northern. There is no doubt that this is what took place, but there is a deficiency in records from which the time could be established.

Thus it was that these two men succeeded to whatever official status attached to Gardner and O'Rourke as de facto officers of Personal, but the steps by which that result was accomplished are not clearly stated.

The relationship between Personal and Funds is presented in the first case, and requires decision in the second, because the theory of Franklin as third-party plaintiff is that if liability is to be visited upon it because of the way in which the account was handled, that liability must ultimately be visited upon Funds.

### Franklin Bank Matter

Funds was the factor of Personal by reason of arrangements to that end initiated by the said Hyman Gardner, in the course of which he represented that Personal was a wholly owned subsidiary of Midland, and that the latter was a publicly held corporation whose stock was traded "over the counter," and of which corporation he was secretary and O'Rourke president; also that he and O'Rourke would personally guarantee the payment of any loans made by Funds to Personal.

A Dun and Bradstreet report procured by Funds, indicated that Midland had a net worth of over $460,000, upon which showing a factoring agreement dated December 6, 1956 was entered into between Funds and Personal, and the personal guarantees of Gardner and O'Rourke and Midland were endorsed thereon.

Between December 10, 1956 and January 17, 1957 Personal, by the terms of a factoring agreement in evidence, assigned to Funds its accounts, namely, its receivables from Remington Rand for sales commissions above referred to, the total of the assigned accounts being $51,-917.61, and against these assignments Funds advanced to Personal during the same period, a total of $31,150.

Of the customer contracts under which Personal had earned the selling commission, Remington Rand had accepted by about February 1, 1957 a total of $9,731.-90, and forwarded checks for that amount to Personal. Those checks were deposited in the Personal account and against that total Personal drew its check for $9,682.74 in favor of Funds for application to the advances above described of $31,150.

It is this transaction to which the trustee objects and as to which he seeks to hold the bank liable.

This account was opened February 6, 1957 and the signature card bears the names of Murray J. Levy as president and Robert Siegel as secretary-treasurer of Personal. Seemingly but two deposits were made:

February 6, 1957   $9,408.62
February 7, 1957      49.16
                    274.12   $9,731.90.

The said pre-trial order lists the contested issues of law against this bank as follows:

1. The legal effect of the resolution pursuant to which this account was opened and the payment of the said check of February 13, 1957 to the order of Funds which was signed by the defendant Siegel as secretary of the bankrupt.

The signature card is regular on its face and there was no special circumstance to cause the bank to challenge the capacity of Levy and Siegel so to open the account. Siegel had been known to the bank for a considerable period of time so that it was not dealing with a stranger, and nothing is shown in the evidence to justify special inquiry on the part of the bank as to Siegel's status as an officer of Personal.

It is to be remembered that the check to Funds was not an instrumentality for diverting corporate funds for the benefit of either Siegal or Levy, as was true as to certain individuals in the cases of Wen Kroy Realty Co. v. Public National Bank, etc., 260 N.Y. 84, 183 N.E. 73; Wagner Trading Co. v. Battery Park Nat. Bank, 228 N.Y. 37, 126 N.E. 347, 9 A.L.R. 340; Fidelity & Deposit Co. of Maryland v. Queens County Trust Co., 226 N.Y. 225, 123 N.E. 370; Susquehanna Line, Inc. v. Auditore, 223 App. Div. 585, 229 N.Y.S. 181.

The use that was made of this check was payment of a corporate indebtedness of Personal, and that result could well have come about even though the bank had insisted upon the holding of a directors' meeting of Personal in the bank's offices and the proper adoption of a resolution by the directors. In other words, the lapse, if such it was, in failing to exact from Personal a completely formal corporate proceeding was of no benefit to the bank, nor did it result in other than a conventional application of Personal funds to the payment of a Personal debt.

The answer to the first question is that the legal effect of the reliance of the bank upon the certificate filed by Levy and Siegel on the part of Personal on February 6, 1957, for the purposes of this case, is found to have been sufficient to justify the bank in opening the account and in paying the said check to Funds.

2. Were Siegel and Levy de facto officers of the bankrupt and duly qualified to execute the resolution?

The evidence is not clear enough to answer this question categorically; they acted as and are deemed to have been de facto officers, and the bank was justified in relying upon their apparent capacity to execute the said resolution.

The said order lists questions of fact as follows:

1. "Was the bank on notice that the bankrupt's board of directors had not approved the resolution?"

The answer to this question is negative.

2. "Was the bank acting in good faith in accepting this account from the defendants Siegel and Levy on the faith of the corporate certificate above mentioned, or was it in fact relying solely

on its past relationship with the defendant Siegel, who was known to them and who had been doing a substantial business with the bank in his own name or under corporate guise?"

The answer to this question is in the affirmative as to the good faith of the bank, and also that the latter relied in part upon its earlier relationship with the defendant Siegel.

3. "Is the bank liable to the plaintiff for the proceeds of said checks by reason of subdivisions (1) and (2) of this paragraph?"

The answer to this question is in the negative.

Subdivisions (c) and (d) of this question need not be answered in view of the foregoing.

Since the plaintiff cannot succeed against Franklin in its main cause, the third-party action against Funds is necessarily concluded by this holding. The question of the liability of Funds will be later discussed.

### Commercial Bank Matter

The evidence does not disclose when this account was opened by Northern, nor does it appear what balance, if any, was in that account on November 21, 1956.

On that date, what purports to be a resolution entitled, "Certificate of resolutions authorizing deposit of checks or other commercial paper payable or endorsed to the order of corporations" bearing the corporate seal and the signature of Hyman Gardner as secretary and certified by John M. O'Rourke as president of Personal, was received and filed by the bank. That resolution provided in part as follows:

"1. That Commercial State Bank and Trust Company of New York is hereby authorized to receive from Northern Appliance Stores, Inc. (hereinafter referred to as 'depositor') any and all checks, * * * payable to this corporation (namely Personal) or to its order when bearing the apparent endorsement of this corporation either by handwriting, typewriting, stamp impression or by any other means, with or without the signature of any person purporting to be an officer or agent of this corporation."

The following provisions refer to the authority of any officer or agent of the depositor, and the capacity of the bank to assume without inquiry the validity of deposits and withdrawals pursuant to the resolution, and that the secretary is authorized to certify and deliver copies of these resolutions to the bank.

What was accomplished by the above resolution was the deposit of checks drawn to the order of Personal in the account of Northern. That result could have been brought about by the deposit of Personal checks in a Personal bank account, and the drawing of checks against that to the order of Northern, and the deposit thereof in a Northern account. In other words, the practice initiated under the resolution was a shortcut to a transfer of Personal checks into the account of Northern, which would have been a questionable transaction but for the fact that during the months involved the affairs of these two corporations were really conducted as one, in order that the typewriter business of Northern might be expanded so as to embrace the selling of Remington Rand machines under the ostensible auspices of Personal. This being true, the commingling of the funds of the two corporations was a natural incident, and the criticism leveled against the bank for acting pursuant to the resolution of November 21, 1956 must be understood in the light of these actualities.

It is stated in the brief for the bank that checks did not come in for deposit until December 11, 1956, the last one being dated January 18, 1957; meanwhile, $11,382.91 had been collected in checks payable to Personal and so credited to Northern.

After the latter date, the bank refused further to conform to the resolution for the reason that the consent of stockholders of Personal which was stated to be

necessary at the time of the filing of the resolution, was never obtained.

The excuse given by the officers of Personal for so failing was that since Midland was a publicly owned corporation, the consent of its stockholders could not be obtained as a practical matter. That excuse is not convincing, for the reason that Midland was the only stockholder of Personal, and its consent would not have been difficult to obtain.

There is to be said that as a matter of law the chances are that a stockholders' consent was not actually necessary because the evidence is that the bank was so advised at a later date; this means that the action of the bank in failing, after January 18, 1957, to credit Personal checks to the Northern account, was consistent with its earlier stated requirement, and therefore with careful attention to the handling of the account.

What is more convincing to this court, however, is that this record does not present any evidence whatever that checks drawn by Northern against these deposits were not used for the corporate purposes of Personal and/or Northern in connection with the operation of Personal, namely, the cost of advertising and maintaining records, salesmen's commissions, and the like; that is to say, as to this bank account there is no proof that the proceeds of the checks which were payable to Personal, found their way in any guise into the pockets of officers of either corporation or were otherwise diverted from the business of Personal. It is probably unnecessary to repeat that Commercial as a bank received no benefit whatever from the course of dealing which has been explained.

The trustee has produced no figures whatever, constituting or resembling a balance sheet of either Personal or Northern (in the absence of schedules in bankruptcy that is easily understood) to demonstrate that Personal was insolvent at the time that the foregoing resolution was acted upon by the bank, or indeed at any established date prior to the filing of this petition in bankruptcy which occurred in the month of April, 1957. In other words, there is no showing of any equitable reason why the court should be astute to find technical defects in either the resolution itself or in the conduct of the bank in rendering banking services in faith thereof.

Since an action for money had and received, which is the description appearing in the pre-trial order, involves equitable concepts, the plaintiff's case is lacking in this fundamental requirement.

Technically, if Northern failed to apply the proceeds of the checks so deposited in its account, for the benefit of Personal, a cause of action might exist in favor of the latter against Northern, but certainly nothing has been adduced to demonstrate a cause of action by Personal against Commercial.

The pre-trial order lists the following contested issues of law against this bank:

1. The validity and effect of the resolution above described.

■ In the opinion of this court, while the resolution is incomplete in failing to list the names of the holders of 100% of the capital stock of the company, it nevertheless bears the seal of the corporation and was signed by those who conceived themselves to be officers and seemingly were de facto officers in succession to Gardner and O'Rourke, as the result of the transactions above stated concerning the acquisition by the former of the stock of Midland. As between the trustee in bankruptcy of Personal and this bank, the resolution is held to be valid, and the acceptance by the bank for deposit in the Northern account of the total sum of $11,382.91 is not subject to challenge in this litigation.

■ 2. "Was a duty imposed on the bank to obtain the consent of the stockholders of the bankrupt in addition to the resolution of its Board of Directors?"

In view of the testimony and the somewhat equivocal provisions of statutory law of the State of New York touching this subject, the answer to this question is in the negative.

388

■ The following issues of fact are stated in the order:

1. "Was the bank negligent in accepting these checks for deposit in the light of the incomplete resolution dated November 21, 1956 which failed to set forth on the face of the instrument the holders of 100% of its issued stock and their consent to the authorizations contained therein?"

In the opinion of this court, the foregoing is to be answered in the negative.

2. "Was there a diversion of the bankrupt's funds brought about by the action of the bank in accepting the checks for deposit in the aforegoing manner?"

There is no proof to sustain an affirmative answer to the foregoing question; therefore, the answer is negative.

3. "Is the bank liable to the plaintiff for the proceeds of said checks by reason of subdivisions (1) and (2) of this paragraph?"

The answer to the foregoing is in the negative.

### Siegel and Levy

The status of these individuals has been sufficiently indicated above to render unnecessary further exposition except as may be required in answer to the issues concerning them as outlined in the said pre-trial order:

■ 1. "Are the defendants Siegel and Levy liable to the plaintiff for the diversion of said sum amounting to $9,731.90?" The reference is to the deposits made in the Franklin account above discussed.

The principal criticism leveled against these individuals by the trustee is that they were never duly elected as officers of Personal and must be regarded as interlopers in their participation of its affairs. It is again the duty of the court to look at matters of substance rather than form. Since Siegel and Levy acquired the control of Midland and since Personal was a kind of adjunct of Northern, it can scarcely be a cause for wonder that precise corporate steps were not taken to preserve the technical niceties of the situation so created. If it could be shown that Siegel and Levy diverted Personal funds into their own pockets or for their own benefit, the court would be required to deal with them as persons who should be held accountable to the trustee in bankruptcy of Personal; such, however, is not the case, and the following statement appearing on page 24 of the trustee's main brief cannot be accepted:

"Accordingly, when Siegel and Levy signed the certificate and when Siegel signed the check for $9,682.74, drawn on the Franklin National Bank, they converted the assets of the corporation and are liable therefor."

The evidence does not support the quotation. The check was used to pay an indebtedness owing by Personal to Funds; before the said payment was made, as the latter demonstrated by the production of records, the correctness of the claims was established and there was no effort at the trial on the part of the trustee to discredit those records.

2. "Were said men interlopers who forged the bankrupt's name to said endorsements on the checks?"

The answer to the foregoing is in the negative.

3. "Could Siegel and Levy become de facto officers in this corporation without assuming the reins or conduct of its management and operation?"

The foregoing is deemed to be a rhetorical question and does not require an answer.

4. "Are they liable to the plaintiff to the exclusion of the defendants Franklin National Bank and Funds for Business, Inc.?"

The answer to the foregoing is in the negative.

There remains for decision the cause of action asserted in No. 18826 above referred to on the part of this plaintiff against Funds, and the third-party complaint in case No. 18608 on the part of Franklin against Funds. These were consolidated for trial according to the

provisions of the pre-trial order and therefore will be so dealt with.

As to this branch of the case, the pre-trial order outlines the following issues of law against Funds. In this connection it should be said that the court clearly understood the plaintiff's attorney to state during the trial that he did not question the validity or legal effect of the factoring agreement with Personal.

1. "Was the bankrupt insolvent on the date when Funds for Business Inc. procured the sum of $9,682.74 on February 13, 1957?"

The answer to the foregoing is that there is no proof that the bankrupt was insolvent on the date mentioned.

Moreover, the effective date of the factoring agreement with Funds is December 6, 1956 as of which there is no attempt by plaintiff to demonstrate insolvency on the part of Personal. Cf. Doggett v. Chelsea Trust Co., 1 Cir., 73 F.2d 614 at page 617; In re Ace Fruit & Produce Co., D.C., 49 F.Supp. 986 at page 989; Scarborough v. Berkshire Fine Spinning Associates, D.C., 128 F. Supp. 948. The plaintiff's reliance upon Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, is deemed to be mistaken in that there is here present no evidence that Personal as assignor retained the right to collect the accounts covered by the factoring agreement, and apply them as it saw fit, to the payment of any corporate debts whatever.

That this is a distinction of great moment, see McCluer v. Heim-Overly Realty Co., 8 Cir., 71 F.2d 100 at page 103.

2. "Did said defendant know of it or have reason to believe that said bankrupt was then insolvent?"

In answer to the foregoing, in the opinion of this court there is no evidence to sustain a finding that the defendant knew or had reason to believe that Personal was insolvent on either date mentioned.

3. "Was this defendant preferred as a creditor within the purview of the

Bankruptcy Act and therefore accountable to plaintiff?"

The major difficulty which confronts the plaintiff is in establishing the fact of insolvency on the part of Personal at any time, and particularly on December 6, 1956 when the factoring agreement was entered into, which is thus characterized in the plaintiff's brief, at page 27:

"(i) Though the factoring agreement was signed and schedules taken from the bankrupt—a stripping of the bankrupt's assets—the true and only transaction was between Funds and Midland Commercial."

There is no evidence to support the foregoing statement, namely there is no showing that Personal was without assets other than the subject-matter of its transfer of property to Funds. There is no purported tabulation of the assets of Personal on the critical date, which presumably consisted of accounts receivable from the sale of typewriters which had to be reported to Remington Rand for approval; other assets may have existed, since the contrary cannot be presumed.

There is no tabulation of Personal's then apparent liabilities.

Therefore there is no showing of its insolvency at that or any other specified time.

The complained of transaction did not involve a transfer of accounts receivable to secure a past indebtedness; the transfer as shown by the testimony was for a present consideration, namely, money advanced by Funds to Personal, the details of which have been amply demonstrated. Therefore, the $9,682.74 payments above described were not preferential within the contemplation of the Bankruptcy Act.

The answer to this question therefore is in the negative.

4. "That in permitting Messrs. Siegel and Levy to handle the bankrupt's funds said defendant (meaning Funds) did not exercise dominion over said funds and conspired with Siegel and Levy to obtain control of said funds thereby

"failing to obtain any title thereto and that since the same having occurred within 4 months of the filing of the petition in bankruptcy the plaintiff is entitled to the recovery of said money."

It will be observed that the foregoing is not a question and it is not stated in the form of a clear issue but rather as an argument.

Assuming that it be treated as stating an issue, the answer to be made is as follows:

(a) Siegel and Levy functioned, as it has been the effort heretofore to explain, of their own volition and pursuant to their taking over of Midland; this was not by the permission of or connivance with the defendant Funds. The circumstances attending the opening of the bank account and the deposits and withdrawals therefrom have been sufficiently explained to indicate that the question of dominion over the deposit on the part of Funds was never the subject of testimony; the handling of that account was clearly a corporate act of Personal (pursuant to the factoring agreement) for whom Siegel and Levy were then de facto officers.

In conclusion, it is to be observed that no cause has been demonstrated against Funds on the part of the plaintiff and since no liability attaches to Franklin, as has been heretofore stated, there is no occasion for it to assert a third-party claim against Funds.

The result of the foregoing is that judgment is rendered in favor of the two banks named, and of Siegel and Levy, and of Funds, dismissing the complaint for failure of proof.

The foregoing is to be deemed a statement of findings of fact and conclusions of law.

If additional findings are desired, they may be settled on notice, but will not be considered in the absence of a transcript of such part of the testimony as may be deemed applicable.

Settle judgment in accordance with this decision.